**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 49039**

| | |
|---|---|
| STATE OF IDAHO, ) | |
| ) | **Opinion Filed: April 20, 2023** |
| **Plaintiff-Respondent,** ) | |
| ) | **Melanie Gagnepain, Clerk** |
| v. ) | |
| ) | |
| JASON M. ROBERTS, ) | |
| ) | |
| **Defendant-Appellant.** ) | |
| ) | |

Appeal from the District Court of the Third Judicial District, State of Idaho, Payette County. Hon. Susan E. Wiebe, District Judge.

Judgment of conviction for two counts of lewd conduct with a minor child under sixteen, <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender; Elizabeth A. Allred, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Andrew V. Wake, Deputy Attorney General, Boise, for respondent.

_____

HUSKEY, Judge

Jason M. Roberts appeals from his judgment of conviction for two counts of lewd conduct with a minor child under sixteen. For the reasons that follow, we affirm Roberts' judgment of conviction.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

When asked about recent negative behavior, Roberts' fifteen-year-old son informed his mother that she would understand if she saw the signs that Roberts "was sexually hurting" him. The mother called a friend and, ultimately, an interview at a Children at Risk Evaluation Services (CARES) facility was arranged for the child.

1

At the beginning of the CARES interview, the interviewer informed the child that the interviewer was going to introduce the child to a nurse after the interview. The interviewer also told the child that "it's just our job today to make sure that you're safe and that your body is safe and healthy." Upon hearing this, the child appeared taken aback. The interviewer clarified that "they're just going to see how tall you are and how much you weigh." The child responded, "Okay, I thought they were going to test me for [sexually transmitted infections]. I was like, ummm." The interviewer said, "They're just going to check in with you," and asked, "Does that sound okay?" The child answered, "Yeah."

During the CARES interview, the child detailed how Roberts had sexually abused the child starting when he was seven or eight years old. The child related that the last episode of sexual abuse occurred about two and one-half years prior to the CARES interview. While discussing the instances of sexual abuse, the child stated that after the abuse, he struggled with "suicidal stuff" that resulted in the child being "locked up." The child indicated that after his release, he again struggled with "suicidal stuff" because the abuse continued. He admitted during the interview that he was having "a couple" thoughts about suicide, described his preferred method of self-harm, and indicated that at the time of the interview, he felt like engaging in self-harm a "little bit."

The interviewer took a break and later testified the break was to consult the doctor about the disclosures. Upon returning to the interview and following up with the disclosure of self-harm, the child stated, "I can guarantee you that I'm safe . . . . I don't want to get locked up again." Near the interview's end, after talking about the abuse, the child volunteered that he was "just over it" and he "want[ed] this dealt with." Following the interview, the child saw a physician for a medical examination but declined an examination of his genitals or anus. The child also declined testing for sexually transmitted infections. According to the physician, he and the child talked about "doing an exam" and the child responded that "he wasn't concerned, that it had been so long and he was acting and feeling normal." The physician also relayed that the child "didn't want [the physician] to look because [the child] wasn't having any current problems."

After the CARES interview, a grand jury indicted Roberts for two counts of lewd conduct with a minor child under sixteen. I.C. § 18-1508. At trial, the district court admitted a recording of the CARES interview over Roberts' objection. In doing so, the district court found that the child was capable of making statements for medical purposes and that "there is little reason to

2

doubt [the child's] motivation in making the disclosures." Both the child and Roberts testified at trial. Ultimately, the jury found Roberts guilty of both counts. Roberts appeals.

## II.

## STANDARD OF REVIEW

The decision to admit evidence is generally reviewed for an abuse of discretion. *State v. Almaraz*, 154 Idaho 584, 590, 301 P.3d 242, 248 (2013). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018).

## III.

## ANALYSIS

Roberts asserts the district court erred in admitting the recording of the CARES interview and that the error was not harmless. The State responds that the CARES interview was admissible pursuant to Idaho Rule of Evidence 803(4) because the child's statements during the interview were made for a medical purpose. Alternatively, the State contends that any error in the admission of the CARES interview is harmless. We hold that, in this case, the district court did not err in admitting the CARES interview because the child's statements made during the interview[1] were, under the totality of the circumstances, made for a medical purpose.

---

[1] Below, and on appeal, the parties made general arguments about the admissibility of the Child at Risk Evaluation Services (CARES) interview pursuant to Idaho Rule of Evidence 803(4) rather than conducting a specific analysis of individual statements. As such, we will take the same general approach, but we note that I.R.E. 803(4) only provides an exception for hearsay if the particular *statement* meets the rule's criteria. That some statements within a CARES interview could satisfy the criteria in I.R.E. 803(4) does not mean all statements made during a CARES interview would. Statements that do not meet that criteria would have to be admitted pursuant to another rule. *See State v. Christensen*, 166 Idaho 373, 381, 458 P.3d 951, 959 (2020) (noting "a general objection" to a CARES interview, "without specifics as to which statements were inadmissible and why, is insufficient to preserve the error for appeal").

3

## A. Admissibility of the CARES Interview Recording

Roberts asserts "it is clear that [the child] did not intend for his statements to be used for medical diagnosis or treatment" and, consequently, the recording of the CARES interview admitted at trial contains inadmissible hearsay. The State responds that the district court's determination regarding the child's intent for making the statements is a factual finding and that this finding is supported by substantial and competent evidence. In reply, Roberts asserts the district court's determination of the child's intent is a legal conclusion, not a factual finding that would be entitled to deference unless clearly erroneous.

Hearsay is defined as an out-of-court statement offered "to prove the truth of the matter asserted in the statement." I.R.E. 801(c)(2). On appeal, the parties do not dispute that the child's statements given during the CARES interview constituted hearsay. Generally, hearsay is inadmissible during trial unless a recognized hearsay exception applies. I.R.E. 802; *State v. Stanfield*, 158 Idaho 327, 341, 347 P.3d 175, 189 (2015). One such exception is for a statement that "is made for--and is reasonably pertinent to--medical diagnosis or treatment" and that "describes medical history; past or present symptoms or sensations; or their source." I.R.E. 803(4). The parties' arguments on appeal center on one requirement of this exception--specifically, whether the child's statements were "made for" a "medical diagnosis or treatment."

When a child is the declarant, a trial court considers the totality of the circumstances to determine whether the statements were made for a medical diagnosis or treatment. *State v. Christensen*, 166 Idaho 373, 376, 458 P.3d 951, 954 (2020). Factors to consider may include:

> [T]he child's age; whether the child understands the role of the physician in general; whether the child was suffering pain or distress at the time; whether the child's statements were inappropriately influenced by others, as by leading questions from the physician or a previous suggestive interrogation by another adult; whether the examination occurred during the course of a custody battle or other family dispute; the child's ability and willingness to communicate freely with the physician; the child's ability to differentiate between truth and fantasy in the examination itself and in other contexts; whether the examination was initiated by an attorney (which would suggest that its purpose was for litigation rather than treatment); and the timing of the examination in relation to the trial.

*State v. Kay*, 129 Idaho 507, 518, 927 P.2d 897, 908 (Ct. App. 1996). If the foregoing factors, and others reasonably related to the inquiry, give little reason to doubt the child's motivation, "the

4

district courts may infer the criteria of I.R.E. 803(4) are met." *Christensen*, 166 Idaho at 378, 458 P.3d at 956.

We first address the parties' dispute about whether a child's intent is a factual finding or a legal conclusion. Roberts asserts that the totality of the circumstances test in *Christensen*, while based on various factual findings, results in a legal conclusion. Under his approach, a child's age is a factual finding while the impact of the child's age on the totality of the circumstances is a legal question. We disagree. When addressing a child's intent under I.R.E. 803(4), Idaho precedent indicates that this intent is a factual determination for a trial court. *See Christensen*, 166 Idaho at 387-79, 458 P.3d at 956-57 (noting trial court "*found* little reason from the record to doubt that the statements made by [the children] fell within the exception for medical diagnosis or treatment") (emphasis added); *Kay*, 129 Idaho at 518, 927 P.2d at 908 (holding "several factors *support* the trial court's *determination* that [the child's] statements were made for purposes of diagnosis or treatment") (emphases added). This approach is consistent with other inquiries regarding a person's state of mind. *See*, *e.g.*, *State v. Hansen*, 138 Idaho 791, 796, 69 P.3d 1052, 1057 (2003) (explaining whether consent to search was voluntary is question of fact to be determined by all surrounding circumstances). In addition, one federal circuit has held that a trial court's determination that a "doctor was consulted for purposes of medical treatment" is a "finding of fact."[2] *Ring v. Erickson*, 983 F.2d 818, 820 (8th Cir. 1992). Finally, we note the Idaho Supreme Court in *Christensen* agreed with the trial court's finding that there was "little reason from the record to doubt that the statements made by [the children] fell within the exception for medical diagnosis or treatment" and then proceeded to observe that "independently applying the factors" also "supports admissibility of the statements." *Christensen*, 166 Idaho at 378-79, 458 P.3d at 956-57. If, as Roberts contends, a child's intent for purposes of I.R.E. 803(4) is a legal question, there would have been no need in *Christensen* to delineate between the trial court's analysis and the independent evaluation by the Idaho Supreme Court. For these reasons, we hold that a child's intent for purposes of I.R.E. 803(4) is a factual finding. On appeal, we will not overturn a factual

---

[2] Because the federal rule is similar to Idaho's rule, *compare* F.R.E. 803(4), *with* I.R.E. 803(4), federal case law aids our interpretation. *See State v. Carrasco*, 117 Idaho 295, 298, 787 P.2d 281, 284 (1990).

finding regarding a child's intent if it is supported by substantial evidence. *See State v. Crea*, 119 Idaho 352, 354, 806 P.2d 445, 447 (1991).

Regarding the child's intent in making statements during the CARES interview, the district court found: (1) "the medical examination was not associated with a domestic dispute"; (2) the child's parents "had already separated and/or divorced"; (3) an attorney did not initiate the CARES interview; (4) there was "no indication that the examination did not comply with [National Institute of Child Health and Human Development] protocol with non-leading questions"; (5) there was "no suggestion that [the child] had been interrogated by law enforcement prior to the interview"; (6) the child was not "inappropriately influenced by others"; (7) the CARES "interview took place prior to trial"; (8) the child was fifteen years old at the time of the CARES interview and "capable of making statements for purposes of medical diagnosis and/or treatment"; (9) there was "little reason to doubt [the child's] motivation in making the disclosures"; and (10) the child "was in distress, as evidenced by his acting out." Initially, the district court also found that "the examination was performed at the hospital" but, later at trial, the State represented that the CARES interview took place at the Family Justice Center. The district court held that the Family Justice Center was "not on the same level," but that, "even without the hospital setting, [the] analysis remains the same."

Because the factual determination of a child's intent is based on a totality of the circumstances, undue emphasis or analysis of only one factor is inappropriate. *See Christensen*, 166 Idaho at 378, 458 P.3d at 956 (holding Christensen's focus on whether victims knew their statements were made for medical purpose was myopic and failed to address totality of the circumstances). The *Christensen* Court held:

> Finally, and most importantly, even though CARES interviews serve a dual medical and forensic purpose, A.M.O. and A.G.O.'s statements were admissible because their statements remain inherently reliable; they are gleaned from a process designed to aid and inform treatment and diagnosis of the child's *medical condition*. In these circumstances, the child would "still have the requisite motive for providing the type of 'sincere and reliable' information that is important to that [medical] diagnosis and treatment." *Webster v. State*, 151 Md.App. 527, 827 A.2d 910, 920 (2003).

*Christensen*, 166 Idaho at 379, 458 P.3d at 957. Thus, *Christensen* holds that where a CARES interview is conducted in conformity with the generally accepted standards for such interviews, a

child's statements made during the interview are inherently reliable. *Christensen* also holds that focusing only on one element of the totality of the circumstances in assessing the child's intent in making the statements is analytically inappropriate.

Roberts argues the statements made by the child were not made for medical purpose as the child did not intend for the statements to result in a medical diagnosis and was not seeking any medical treatment. For example, Roberts argues that "within the first thirty seconds of the forensic interview, [the child] made it clear that he was not interested in a physical examination." We do not agree with that characterization of the video. At most, the child reacts to the idea of testing for sexually transmitted infections but does not say he is unwilling to undergo a medical exam and, in fact, immediately thereafter, the child agrees to participate in at least a partial medical examination. However, even if we were to focus only on the somewhat contradictory statements of the child, like in *Christensen*, this argument focuses only on one element and ignores the totality of the circumstances surrounding the statements and the context in which they are made. At the beginning of the interview, the child reacted[3] when informed that personnel at CARES would "make sure that [the child is] safe and that [his] body is safe and healthy." After the child's reaction, the interviewer clarified that "they're just going to see how tall you are and how much you weigh" and "they're just going to check in with you." The child thereafter agreed to participate in a medical examination as explained by the CARES interviewer.

At the time the CARES interview was scheduled, not the mother, law enforcement, or the forensic interviewer had any information that the abuse ended approximately two and one-half years before the interview. Temporal remoteness does not necessarily negate the need for a medical examination following the disclosure of abuse. Additionally, I.R.E. 803(4) applies to statements describing past symptoms, not just those experienced by the declarant at the time of making the statements. That said, this Court recognizes the temporal remoteness of the alleged abuse from the time of the CARES interview and the absence of current symptoms differentiate this case from *Christensen*. In *Christensen*, two children were interviewed at CARES within two

---

[3]     The description of the child's reaction is difficult to correctly identify. On appeal, Roberts characterizes it as a "recoil." The correct adjective is subjective, demonstrating why undue emphasis on one element (the intent of the declarant) is analytically inappropriate and requires addressing the totality of the circumstances.

weeks of their disclosures of sexual abuse and "freely communicated with the staff about physical pain and discomfort they experienced from the abuse." *See Christensen*, 166 Idaho at 375-76, 379, 458 P.3d 953-54, 957. And, the remoteness of the abuse, coupled with the child's statements in this case, certainly weigh in the totality of the circumstances in assessing the indicia of reliability surrounding the statements.

Here, the child makes contradictory statements. For example, the child stated he was not experiencing current physical symptomology as a result of the abuse. This was reiterated during that subsequent exam; the child declined any testing for sexually transmitted infections and declined an examination of his genitals and anus. The child informed the physician that the child "wasn't concerned," that "it had been so long" since the abuse that he was "feeling normal" and did not have any "current problems." However, other statements indicated the child was experiencing physical symptoms related to the abuse that would both inform and warrant a medical examination. For example, during the CARES interview, the child disclosed that as a result of the abuse, he had previously struggled with "suicidal stuff" apparently serious enough to result in him being in a secure facility. The child also indicated that participating in the CARES interview and addressing "all this" and having it all "come up again" made him have a "couple thoughts" about suicide and he was feeling a "little bit" like engaging in self-harm during the interview. However, the child subsequently "guarantee[d]" he was safe because he didn't "want to get locked up again."

The contradictory nature of all the statements clearly informed and guided the subsequent medical exam. The *Christensen* Court described the medical examination as,

> a full head-to-toe medical examination that commonly involves a detailed examination of the genitals and evaluation for possible sexually transmitted diseases or infections. The medical examination is informed by the forensic interview and psychosocial assessment to determine issues the child may have, areas that may need extra focus, any clues about possible physical symptoms and any ideas about possible infections or injuries.

*Id.* at 375, 458 P.3d at 953. Even after the child disclosed the temporal remoteness of the abuse, the doctor still conducted a medical examination, which is unsurprising in light of the child's statements about current feelings of self-harm and notwithstanding the temporal remoteness of the abuse. And, even with the limitations imposed by the child during the exam, the doctor could examine the child for existing signs or symptoms of self-harm and decide the appropriate course of treatment as a result. Other statements made by the child during the interview, including those

indicating strong feelings about Roberts, were additional statements the district court could consider in determining, under a totality of the circumstances, whether the child's statements during the CARES interview were made for a medical purpose.

We now turn to the district court's finding that the child was "in distress." As discussed above, during the interview, the child indicated he was experiencing mental distress as a result of discussing the abuse and, as a result, he was having thoughts of suicide and self-harm. Psychological distress from abuse can undoubtedly motivate a child to give statements for a medical purpose and a medical examination for purposes of assessing self-harm would not necessarily be the same type of medical examination that would follow disclosures of sexual abuse. In other words, a medical examination to assess self-harm could be conducted even with the type of limits the child placed on the medical examination in this case. The child's statements during the CARES interview provide substantial evidence to support the district court's finding that at the time of the CARES interview, the child was in physical pain or "acting out."

Roberts contends that statements given for purposes of mental health treatment do not qualify under I.R.E. 803(4). The Idaho Supreme Court has held that "a psychologist does not provide 'medical' treatment as contemplated by" I.R.E. 803(4). *State v. Zimmerman*, 121 Idaho 971, 974, 829 P.2d 861, 864 (1992). In response, the State asserts that "*Zimmerman* should be overruled" to the extent that opinion "prevents admission of hearsay for purposes of medical diagnosis or treatment of mental health issues." This Court cannot overrule Idaho Supreme Court precedent. However, *Zimmerman* is inapposite in this context. First, the statements at issue in this case were not given to a psychologist; instead, the statements were made in a context that the Idaho Supreme Court has held provides inherent reliability for those statements. Second, unlike *Zimmerman*, the statements given during a CARES forensic interview and psychosocial assessment inform and guide the subsequent medical examination, which helps "determine issues the child may have, areas that may need extra focus, any clues about possible physical symptoms and any ideas about possible infections or injuries." *Christensen*, 166 Idaho at 375, 458 P.3d at 953. Here, the disclosures of self-harm were discussed with the doctor who implicitly concluded a medical evaluation was necessary to assess those symptoms because a medical examination was conducted after the forensic interview.

9

In this case, the district court concluded the child made statements that were sufficiently reliable to be admitted pursuant to I.R.E. 803(4). If the trial court based its findings on substantial evidence, even if the evidence is conflicting, this Court will not overturn those findings on appeal. Additionally, this Court will not substitute its view of the facts for that of the trial court. *State v. Clark*, 168 Idaho 503, 510, 484 P.3d 187, 194 (2021). Although some of the child's statements may be construed as indicating he did not want to undergo testing for sexual transmitted infections, he also agreed to undergo a medical examination. *Christensen* holds that statements given during a properly conducted CARES interview have inherent reliability and precludes focusing on only one factor in determining the child's intent in making the statements at issue. In light of the deference given to the trial court, and the language of *Christensen*, we are constrained to hold the district court did not abuse its discretion in finding the child's statements were made for purposes of medical treatment or examination and, thus, were admissible pursuant to I.R.E. 803(4). Given the totality of the circumstances, there is substantial evidence to support the district court's finding that there was "little reason to doubt [the child's] motivation in making the disclosures."

For the foregoing reasons, we conclude there was substantial evidence supporting the district court's factual finding that the child had a medical purpose in making his statements during the CARES interview. Because the statements, under a totality of the circumstances, were made for a medical purpose, the district court did not err in admitting the recording of the CARES interview pursuant to this hearsay exception.

## IV.
## CONCLUSION

The district court did not err in admitting the recording of the CARES interview because it satisfied the medical purpose exception in I.R.E. 803(4). Accordingly, we affirm Roberts' judgment of conviction for two counts of lewd conduct with a minor child under sixteen.

Judge GRATTON **CONCURS**.

Chief Judge LORELLO, **DISSENTS**

I would hold that admission of the Children at Risk Evaluation Services (CARES) interview was reversible error because the child's statements made during the interview were not made for a medical purpose and the error was not harmless. As such, I dissent.

In order for a hearsay statement to be admissible under the exception provided in I.R.E. 803(4), the statement must be: (a) made for, and be reasonably pertinent to, medical diagnosis or treatment; and (b) describe medical history, past or present symptoms or sensations, or their source. The question in this case is whether the child's statements to the CARES interviewer were made for medical diagnosis or treatment.

As noted, the district court made the following findings regarding the child's intent in making statements during the CARES interview: (1) "the medical examination was not associated with a domestic dispute"; (2) the child's parents "had already separated and/or divorced"; (3) an attorney did not initiate the CARES interview; (4) there was "no indication that the examination did not comply with [National Institute of Child Health and Human Development] protocol with non-leading questions"; (5) there was "no suggestion that [the child] had been interrogated by law enforcement prior to the interview"; (6) the child was not "inappropriately influenced by others"; (7) the CARES "interview took place prior to trial"; (8) the child was fifteen years old at the time of the CARES interview and "capable of making statements for purposes of medical diagnosis and/or treatment"; (9) there was "little reason to doubt [the child's] motivation in making the disclosures"; and (10) the child "was in distress, as evidenced by his acting out." Initially, the district court also found that "the examination was performed at the hospital" but, later at trial, the State represented that the CARES interview took place at the Family Justice Center. The district court held that the Family Justice Center was "not on the same level," but that, "even without the hospital setting, [the] analysis remains the same."

Some of the district court's findings negate some possible nonmedical motivations for the child's statements. Other findings touch on whether others influenced the child's statements or whether the child was capable of making statements for a medical purpose. These findings are helpful to an I.R.E. 803(4) analysis because they eliminate possible concerns with a child's statements. *See State v. Christensen*, 166 Idaho 373, 377-78, 458 P.3d 951, 955-56 (2020) (noting that an examination initiated by an attorney "would suggest that its purpose was for litigation rather than treatment"). They do not, however, establish as a positive matter that the child had a medical purpose. This leaves the findings that there was "little reason to doubt" the child's motivation, he was in distress, and the CARES interview took place at a Family Justice Center.

11

The State asserts that there is substantial evidence supporting the district court's "finding regarding the purpose of [the child's] statements in the interview," ostensibly referring to the finding that there was "little reason to doubt" the child's motivation. First, the State notes that the child was informed several times that the CARES interview "was part of a process to ensure he was healthy." What the child was told about the reason for the process does not necessarily reflect the child's intent. In other words, even if the child was expressly told the purpose of the interview was for medical treatment, that advisory does not necessarily mean the child's intent in making subsequent statements was for that same purpose. The facts of this case illustrate that point. At the beginning of the interview, the child reacted when informed that personnel at CARES would "make sure that [the child is] safe and that [his] body is safe and healthy." After the child's reaction, the interviewer clarified that "they're just going to see how tall you are and how much you weigh" and "they're just going to check in with you." The child's response and agreement to the limited examination as explained by the CARES interviewer shows that the child lacked a relevant medical purpose in giving his statements detailing the sexual abuse. Notably, the child's statements during the CARES interview had little or nothing to do with his height or weight or a generic "check in." The child's lack of a relevant medical purpose continued throughout the CARES process, as evidenced by the child declining any testing for sexually transmitted diseases and declining an examination of his genitals and anus during the medical exam performed after the interview. The child informed the physician that the child "wasn't concerned," that "it had been so long" since the abuse that he was "feeling normal," and that he did not have any "current problems."[1] In my view, the temporal remoteness of the alleged abuse from the time of the CARES interview and the absence of current symptoms are significant and differentiate this case from *Christensen*. In light of the child's actions and statements (as well as the CARES interviewer's representations regarding the limited scope of the examination), the child being informed that the purpose of the CARES process was to keep his body "safe and healthy" does not provide

---

[1]     I recognize, as the State observes, that I.R.E. 803(4) applies to statements describing past symptoms, not just those experienced by the declarant at the time of making the statements. *See* I.R.E. 803(4)(B). The child's statement that he was not experiencing any "current problems," however, indicates that he lacked a relevant medical purpose at the time regardless of whether he described past symptoms.

12

substantial evidence that the child had a medical purpose behind any of his statements during the interview. Contrary to the district court's finding, there was ample reason to doubt the child's motivation for purposes of I.R.E. 803(4). *Cf. State v. Nelson*, 131 Idaho 210, 216, 953 P.2d 650, 656 (Ct. App. 1998) (where child went to emergency room within an hour of sexual assault complaining of pain in rectal and vaginal area, there was no basis to infer the child "believed she was seeing the doctor for any reason other than diagnosis and treatment").

Second, the State asserts that the child's mother "understood that the interview was for medical purposes" and that she spoke to the child "in general terms about the CARES interview before it occurred." But the State fails to provide any citation to the record showing that the mother communicated the medical purpose to the child. As Roberts notes, the child related during the CARES interview that his mother told him that he needed to go to the interview but that his mother did not say anything else. Without being communicated to the child, the mother's knowledge of the purpose of the CARES interview does not provide support for the district court's finding, much less evidence supporting a conclusion that the child's statements were made for a medical purpose.

Third, the State notes that the child had been interviewed at CARES two times previously and "would have been told on those prior occasions about the reason for those interviews" and "would have been examined by a health care provider following those interviews." In support, the State cites to portions of the record showing that the child had been through the CARES process twice before. However, the State fails to provide citations to the record regarding what the child was told during those CARES interviews or if they were followed by a medical examination. Even if we assumed that the child had been informed of the purpose of CARES interviews in the past and had been medically examined as part of that process, this would not change his intent in submitting to the CARES process at issue in this case or his agreement to a limited examination at the inception of the CARES interview. Nor does the child's purpose in making statements in a prior CARES interview extend to subsequent CARES interviews, particularly interviews conducted after the need for medical treatment has dissipated. As discussed, the child's reaction shows he lacked a relevant medical purpose. Consequently, evidence of the past CARES interviews does not provide substantial evidence for the district court's finding.

Next, the State asserts that "all of the same factors suggesting the reliability and medical nature of the CARES process that the [Idaho Supreme Court] identified in *Christensen* are present

13

here." The State reiterates many of the district court's findings regarding these factors addressed elsewhere in this opinion and adds that the CARES interviewer "emphasized the importance of telling the truth" to the child. Again, this factor helps exclude a possible concern (that is, whether the child was lying) but, by itself, does not establish that the child had a medical purpose. Thus, the CARES interviewer's emphasis on telling the truth does not provide substantial evidence that the child had a medical purpose as required for admission of his statements under I.R.E. 803(4).

The district court's finding that the child was "in distress" (understood in context) concerns the child's psychological state, not his physical condition, given that the district court mentioned that the child's distress was "evidenced by his acting out" prior to the CARES interview. Notably, however, there was no evidence that, at the time of the CARES interview, the child was in physical pain or "acting out." The only evidence was to the contrary, given that the child informed the physician after the CARES interview that the child was "feeling normal" and there were not "any current problems." In addition, the last episode of abuse occurred about two and a half years before the CARES interview. While psychological distress from abuse can undoubtedly motivate a child to give statements for a medical purpose, in this case the child declined the relevant medical examination and there was no indication during his CARES interview that he was seeking medical diagnosis or treatment. Given that the child did not intend to seek relevant medical care, his psychological distress, standing alone, is not substantial evidence that he gave his statements during the CARES interview with a medical purpose.

For largely the same reason, the district court's finding that the interview occurred at a Family Justice Center does not provide substantial evidence that the child had a medical purpose. Although the setting of an interview can influence a declarant's purpose, the child's actions and statements in this case reveal he lacked a relevant medical purpose despite the setting. This is especially true given the child's statements to the CARES interviewer that the child was "just over it" and "want[ed] this dealt with," which indicate his purpose was other than medical.

Finally, Roberts contends that statements given for purposes of mental health treatment do not qualify under I.R.E. 803(4). Roberts is correct. *See State v. Zimmerman*, 121 Idaho 971, 974, 829 P.2d 861, 864 (1992) (holding that "a psychologist does not provide 'medical' treatment as contemplated by" I.R.E. 803(4)). Moreover, the record indicates that the child did not have a mental health purpose either. The child started counseling many years prior to the interview and

14

had been in counseling off and on for many years. Even if the child needed additional counseling as a result of the prior abuse, or for some other reason,[2] such a need does not provide a cloak of admissibility under I.R.E. 803(4) for a CARES interview.

Having concluded admission of the CARES interview was error, the question becomes whether admission of the interview was harmless. I do not think it was.

Error is not reversible unless it is prejudicial. *State v. Stell*, 162 Idaho 827, 830, 405 P.3d 612, 615 (Ct. App. 2017). Where a criminal defendant shows an error based on a contemporaneously objected-to, nonconstitutional violation, the State then has the burden of demonstrating to the appellate court beyond a reasonable doubt the error did not contribute to the jury's verdict. *State v. Montgomery*, 163 Idaho 40, 46, 408 P.3d 38, 44 (2017). Thus, we examine whether the alleged error complained of in the present case was harmless. *See id.* Harmless error is error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. *Yates v. Evatt*, 500 U.S. 391, 403 (1991); *State v. Garcia*, 166 Idaho 661, 674, 462 P.3d 1125, 1138 (2020). This standard requires weighing the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error. *Id.* If the error's effect is minimal compared to the probative force of the record establishing guilt beyond a reasonable doubt without the error, then the error did not contribute to the verdict rendered and is harmless. *Id.* The reviewing court must take into account what effect the error had, or reasonably may have had, on the jury in the context of the total setting and in relation to all else that happened, which necessarily includes the evidence presented. *Kotteakos v. United States*, 328 U.S. 750, 764 (1946).

Regarding the probative force of the error, the State asserts that the child's statements in the CARES interview "simply duplicate[d] the unobjected-to and properly admitted testimony at

---

[2]     During the interview, the child noted he previously struggled with "suicidal stuff" and got "locked up" as a result. He also stated he subsequently wrote a "graphic letter" about wanting to kill Roberts, which resulted in him getting locked up again for "two and a half years," and being released approximately four months prior to the CARES interview at issue in this case. When asked during the interview if he was having any current suicidal thoughts, the child stated "a couple." When asked to expand on that, the child responded, "not necessarily suicide, but cutting, definitely cutting" and noted his girlfriend broke up with him "last night" and he had to do this "stupid" interview, which he had already done two times before.

15

trial." An error in admitting evidence can be harmless if other evidence, properly admitted, provides the same information. *See, e.g.*, *State v. Miller*, 157 Idaho 838, 846, 340 P.3d 1154, 1162 (Ct. App. 2014) (holding that erroneous admission of 911 call was harmless because it was cumulative of victim's testimony at trial). Roberts responds that the CARES interview contained probative statements that were not part of the child's trial testimony and that, to the extent the CARES interview was cumulative, it was "improper corroboration of [his] testimony."

Roberts is correct that the CARES interview contains information not presented during the child's testimony at trial. During the CARES interview, the child represented that Roberts put his "main area" (the child's euphemism for "penis") in the child's "butt" and that Roberts did this more than once. According to the child's statements during the CARES interview, "once [Roberts] first did it, it continued." The child described one of these incidents as having occurred in his room. At trial, however, the child testified that, the day after he first disclosed Roberts' sexual abuse of him,[3] Roberts told the child, "You're dead"; hit the child, causing the child to fall to the ground; and then Roberts "put his penis in [the child's] butt." The child testified that this incident occurred in the kitchen. After the child's testimony regarding this incident, the following exchange occurred:

| | |
|---|---|
| [State]: | So his, [Roberts'] penis in your butt, was that the only time that happened? |
| [Child]: | Yes. |
| [State]: | Only time? |
| [Child]: | (Nodding.) |
| [State]: | The one time at home on the kitchen floor? |
| [Child]: | Yes. |
| [State]: | I'm sorry. I'll have to start catching on to that. Okay. And so contact of your butt with [Roberts'] penis only happened one time? Is that correct? |
| [Child]: | Yes. |

Thus, the CARES interview did not merely duplicate the child's trial testimony. Instead, the CARES interview provided evidence of more than one incident of lewd conduct, which at trial

---

[3] The child recanted this first disclosure within a day of making it. According to the child's mother, Roberts told the child that he and his sister would be taken away from Roberts and the child's mother if the child continued with the accusation.

he denied happening more than once, and gave an account of one of these incidents occurring in his room, which he did not testify to at trial.

This evidence of at least one additional incident of lewd conduct was highly probative because it was tied to physical evidence that possibly corroborated the child's account of the crime. The physician who observed the child's CARES interview testified at trial. The physician noted that the child's medical records revealed he had experienced rectal bleeding for a period of several months but that, despite "extensive medical workup," no medical disease had been diagnosed. The physician testified "the timing of [the child's] reported rectal bleeding and abdominal pain that he had correlated with the timing that he described that he was being sexually abused." According to the physician, injuries to a child's genitals or anus is "rarely seen," with "less than five percent" of cases having a "definitive finding on their medical exam of sexual kind of abuse injury." In its closing argument to the jury, the State highlighted the physician's testimony, noted the child's trial testimony that there was only one incident, and then noted:

> [The child's] CARES interview goes into a little bit more depth as to how that continued. And if that continued, it continued for a period of time where he tried to starve himself trying to, you know, losing weight, trying to make himself as small and as unnoticed as possible. There's your connection. There's the consistency. There is that less-than-5-percent case, according to [the physician], that [the child] was sexually abused.

This shows that the State, in trying to draw a connection between the child's rectal bleeding and his testimony, relied on information from the CARES interview that the abuse occurred more than one time. From the jury's perspective, continued abuse of this nature, as opposed to a single episode, would better explain why the child's rectal bleeding continued for several months. For this reason alone, the CARES interview carried significant probative force.

Further, as Roberts notes, the CARES interview also contained accounts of physical abuse that the child did not testify about during trial. During the CARES interview, the child described being kicked by Roberts and that the child "threw up one time because [he] couldn't catch [his] breath." During trial, the child described being hit by Roberts' hand, but did not recount being kicked. Similar to propensity evidence, evidence of this additional and more extreme physical abuse may have led the jury to find Roberts guilty of the sexual crimes simply because of other bad acts. *Cf. State v. Folk*, 157 Idaho 869, 878, 341 P.3d 586, 595 (Ct. App. 2014) (holding that a defendant's "prior convictions are merely propensity evidence that allow persons to infer that[,] if

17

[the defendant] committed the prior offenses, he must have committed the offense at issue"). This additional evidence of physical abuse increased the probative force of the error in admitting the CARES interview.

Although Roberts asserts the CARES interview was "improper corroboration," it is not "corroboration" evidence in the strict sense because the statements were not from a third party. *Cf. State v. Harris*, 132 Idaho 843, 847-48, 979 P.2d 1201, 1205-06 (1999) (addressing impact of testimony from third party defense witness). But Roberts' argument reflects a concern in our case law that, when credibility is crucial to a case, even cumulative evidence can result in reversible error. *See id.* (holding that exclusion of defense witness was not harmless error because it was "a case of the alleged victim's word against the defendant's word" and the defense witness would have corroborated defendant's testimony that the top was down on his convertible, contrary to the victim's assertion that the top was up). When the credibility of a witness is at issue, evidence of prior consistent statements by the witness may have a bolstering effect. *See State v. Jones*, 125 Idaho 477, 488, 873 P.2d 122, 133 (1994), *overruled on other grounds by State v. Montgomery*, 163 Idaho 40, 408 P.3d 38 (2017); *see also Cook v. State*, 157 Idaho 775, 781, 339 P.3d 1179, 1185 (Ct. App. 2014) (applying *Jones* in the post-conviction context). Generally, any bolstering effect, standing alone, is insufficient to show reversible error when the jury had an opportunity to observe the witness. *See Jones*, 125 Idaho at 488, 873 P.2d at 133; *see also Cook*, 157 Idaho at 781, 339 P.3d at 1185 (applying *Jones* in the post-conviction context). Here, the CARES interview bolstered the victim's credibility by providing prior consistent statements. Because the jury observed the child's trial testimony, the bolstering effect is not sufficient to show reversible error by itself. Nevertheless, the bolstering effect contributed to the probative force of the error.

In addition, the CARES interview was admitted as an exhibit, which differentiates this case from *Jones* and *Cook*. In those cases, the evidence at issue was trial testimony, not an exhibit that went to jury deliberations. *See Jones*, 125 Idaho at 488, 873 P.2d at 133; *Cook*, 157 Idaho at 781, 339 P.3d 1185. Here, in contrast, the CARES interview was admitted into evidence. As the Appellate Court of Illinois has observed, this "effectively put the [victim] in the jury room during its deliberations where she could continually repeat her testimony." *People v. Sanders*, 375 N.E.2d 921, 924 (Ill. App. Ct. 1978). Admitting the CARES interview into evidence, which gave the jury

the option to review the interview during deliberations,[4] exacerbated the bolstering effect and further added to the probative force of the error.

The State asserts that, "if anything," the admission of the CARES interview "was beneficial to Roberts." The State notes that Roberts' counsel, during closing argument, attempted to show an inconsistency between the child's testimony and his statements during the CARES interview. Specifically, Roberts' counsel asserted that, at trial, the child testified that Roberts' semen had "no taste" but that, during the CARES interview, the child represented that "it tastes like pepper." The State asserts that this argument shows that the admission of the CARES interview benefited Roberts. Yet, at the same time, the State maintains "there was no inconsistency" because the CARES interview shows that the child represented that Roberts' penis--not his semen--tasted like pepper. As the State notes, there was no inconsistency and Roberts' counsel inaccurately recounted the record. But that did not benefit Roberts. The district court instructed the jury that what counsel said during closing argument "is not evidence" and that, "if the facts as you remember them differ from the way the lawyers have stated them, follow your memory." The jury is presumed to have followed this instruction. *See State v. Hall*, 163 Idaho 744, 807, 419 P.3d 1042, 1105 (2018).

Regarding the probative force of the entire record while excluding the error, the State notes that the child's testimony regarding the sexual abuse was detailed, he alleged several times that Roberts sexually abused him, the child "suffered physical symptoms" that "could not be diagnosed at the time" but that the physician testified "were indicative of the sort of sexual abuse [the child] had alleged," the child had mental health symptoms that indicated sexual abuse, and the CARES interview was "trained to notice indications that disclosures are fabricated" but "saw nothing to indicate as much" in his disclosures. The State also notes that portions of the child's testimony were corroborated by other witnesses, including his testimony that he was often alone with Roberts and the child's first disclosure that he later recanted. The probative force of much of this evidence, however, is diminished by the inconsistencies between the child's testimony at trial and his statements during the CARES interview. In addition, the physician's testimony regarding the

---

[4]     The CARES interview was entered as an exhibit at trial but the record does not indicate whether or not the jury actually reviewed the CARES interview during deliberations.

child's rectal bleeding is connected to information found only in the CARES interview and, consequently, loses much of its probative force when the CARES interview is excluded from the analysis. Weighing the probative force of the error against the probative force of the record as a whole without the error, I cannot conclude beyond a reasonable doubt that the error did not contribute to the jury's verdict. Consequently, I would hold the error in admitting the recording of the CARES interview was not harmless.